Rodney **TODD**, as Special Administrator of the Estate of Tiffany Todd, Plaintiff–Appellant,

v.

**SOCIETE BIC, S.A., and BIC Corporation, Defendants–Appellees.**

No. 92–1201.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 8, 1993.

Decided Nov. 12, 1993.

Donald J. Nolan, Joseph T. McGuire (argued), Chicago, IL, for plaintiff-appellant.

Thomas H. Fegan, Johnson & Bell, Jeffrey M. Rubin, David A. Bonoma, Pope & John, Chicago, IL, Michael S. Ryan, William L. Moran (argued), Murnane, Conlin, White, Brandt & Hoffman, St. Paul, MN, for defendants-appellees.

Before POSNER, Chief Judge, and CUMMINGS, BAUER, CUDAHY, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION, KANNE, and ROVNER, Circuit Judges.

EASTERBROOK, Circuit Judge.

In March 1988 Cori Smith, then four years old, picked up a cigarette lighter and set a small fire in her parents' bedroom. She was admonished not to play with lighters or matches—of which the household had many, because all four adults smoked cigarettes. About a week later Cori found a BIC lighter on a table in the living room. Cori used the lighter to set ablaze some papers in the bedroom where Tiffany Todd, then 23 months old, was sleeping. Tiffany died in the conflagration; the adults and the five other children in the household survived. Tiffany's father Rodney, as special administrator of her estate, filed this diversity action seeking damages from the lighter's manufacturer. The parties agree that Illinois, where the fire occurred, supplies the governing law.

Plaintiff has two principal theories: that BIC should have warned customers about the risks lighters pose to households with children, and that BIC should have designed its lighters to resist children's efforts to use them. Failure to choose the right design or give proper warnings made the lighter defective or unreasonably dangerous, in either case leading to liability in tort. BIC moved for summary judgment. It conceded that misuse of lighters by children is foreseeable and that it is possible to make child-resistant lighters at some cost in both money and inconvenience to adult users. In 1992 BIC began selling a child-resistant lighter, and the Consumer Product Safety Commission has directed all other manufacturers to follow suit. 16 C.F.R. Part 1210 (effective July 1, 1994), 58 Fed.Reg. 37557, 37584–91 (July 12, 1993). BIC contended, however, that it gave sufficient warnings and that Illinois does not require manufacturers to make their products child-resistant when parents may take effective precautions. The district court granted BIC's motion and dismissed the suit. 1992 WL 4971 1992 U.S.Dist. Lexis 88 (N.D.Ill.). A divided panel of this court reversed, concluding that a trial is necessary on each of plaintiff's theories. 991 F.2d at 1334 (1993). Concern about the implications of the panel's reasoning led the full court to vacate the panel's decision and set the case for hearing in banc. 991 F.2d 1344 (1993).

I

That fire attracts youngsters—and that cigarette lighters in the hands of children can lead to calamity—no one doubts. According to the CPSC, "for the period 1988–90, these fires [set by children under 5 playing with lighters] caused an annual average of 150 deaths, approximately 1,100 injuries, and nearly $70 million in property damages." 58 Fed.Reg. at 37564. BIC recognized this danger, and its lighters were emblazoned: "KEEP OUT OF REACH OF CHILDREN". Plaintiff deems this warning insufficient because BIC did not tell parents that children between three and five are attracted to flame, able and eager to open closets, cabinets, and purses in order to inspect their contents, and unable to follow instructions not to fiddle with what they find there.

Parents who followed BIC's advice to keep their lighters out of the reach of children did not need separate admonition about youngsters' inability to follow directions. Households are full of potentially dangerous items, including knives, matches, and drugs, that are bound to cause injury in inexperienced hands. BIC told owners to make access *physically* impossible, not to issue instructions to the children. Had the adults in this household followed the warning, there would not have been a fire.

Manufacturers could of course provide secondary warnings about the consequences of not following primary warnings. BIC could have written something like: "Keep this lighter out of the reach of children, and be aware that children not only are resourceful in finding things but also are apt to disobey your instructions not to play with lighters they can get their hands on." It could have amplified this longer warning with data about the number of fires children set with lighters, in order to impress on parents the importance of following the primary warning to make the lighters inaccessible (or, perhaps, to induce the parents to quit smoking). Extended warnings present several difficulties, first among them that, the more text must be squeezed onto the product, the smaller the type, and the less likely is the consumer to

read or remember any of it. Only pithy and bold warnings can be effective. Long passages in capital letters are next to illegible, and long passages in lower case letters are treated as boilerplate. Plaintiff wants a warning in such detail that a magnifying glass would be necessary to read it. Many consumers cannot follow simple instructions (including pictures) describing how to program their video cassette recorders. To be more than a scare tactic, the warning could not stop with the number of fires and deaths. It would have to include the number of lighters sold to households with small children (so that the buyer could determine the risk per lighter) and the number of fires that children set with matches (so that the buyer could evaluate whether it is safer to switch). These numbers are abstract. For a parent determined to smoke, the right question is what to *do*. BIC provided that information.

■ There is a further practical inquiry: will consumers who disdain a bold and (if followed) effective warning be influenced by smaller and more subtle points? If parents leave lighters on living room tables despite "KEEP OUT OF REACH OF CHILDREN", and despite knowing that lighters cause fire (which is why the adults bought them), is a recitation of the CPSC's data likely to alter their conduct? These adults did not heed the Surgeon General's dire warnings, prominent on every package of cigarettes, about the hazards of smoking. They exposed their children to tobacco smoke, which causes more harm than does playing with lighters. Environmental Protection Agency, *Respiratory Health Effects of Passive Smoking* (1992). Would a screed on their lighters based on the CPSC's data about fires succeed where concise advice failed? Extended advice, reducing the likelihood that parents will notice and follow the principal warning, is particularly ill-advised when the additional information is already well known. What parent is unaware that children between the ages of three and five explore and test their surroundings even when told not to? Can it be that only a warning by BIC Corporation will alert parents that kids are at least as successful as cats in getting into cabinets and other hiding places, and that children have minds of their own? Illinois does not require manufacturers to warn consumers about facts they already know, and it does not require manufacturers to dilute the principal warnings with distracting information. *Genaust v. Illinois Power Co.*, 62 Ill.2d 456, 466, 343 N.E.2d 465, 471 (1976); *Riordan v. International Armament Corp.*, 132 Ill.App.3d 642, 648, 87 Ill. Dec. 765, 769, 477 N.E.2d 1293, 1297 (1st Dist.1985).

Plaintiff's warning theory encounters an additional problem: causation. Rodney Todd and the three other adults in the household had received the most vivid warning imaginable: Cori had started a fire with a cigarette lighter only a week earlier. What words could be more potent than this incident? The household knew about both the risk of fire and about Cori's proclivity and ability. All four adults conceded this during their depositions, adding that they appreciated the hazard even before Cori set her first fire. It is inconceivable that adults who left a cigarette lighter within the grasp of a child who had *already* started a fire would have been influenced by any written warning. Cf. *Murphy v. Corey Pump & Supply Co.*, 47 Ill.App.2d 382, 197 N.E.2d 849 (1st Dist. 1964). BIC accordingly is entitled to summary judgment on the warning branch of the case.

## II

■ Since 1965 Illinois has held manufacturers strictly liable for injuries caused by defective products, following the approach of *Restatement (2d) of Torts* § 402A (1965). See *Suvada v. White Motor Co.*, 32 Ill.2d 612, 210 N.E.2d 182 (1965). "Strict liability" does not imply that manufacturers insure consumers against injuries associated with the use (or misuse) of their products. Some products are dangerous even when properly designed, and it is both easier and cheaper for consumers to obtain their own insurance against these risks than to supply compensation case-by-case through the judicial system. "Virtually any product is capable of producing injury when put to certain uses or misuses. . . . Injuries are not compensable in products liability if they derive merely from

those inherent properties of a product which are obvious to all who come in contact with the product. The injuries must derive from a distinct defect in the product, a defect which subjects those exposed to the product to an unreasonable risk of harm." *Hunt v. Blasius,* 74 Ill.2d 203, 211–12, 23 Ill.Dec. 574, 578, 384 N.E.2d 368, 372 (1978).

What, then, does Illinois define as a "defect"? Until recently a state court would have dispatched a case such as ours with the observation that a "dangerous product which bears a warning, and which is safe if the warning is followed, is neither defective nor unreasonably dangerous." *Dugan v. Sears, Roebuck & Co.,* 113 Ill.App.3d 740, 741, 69 Ill.Dec. 620, 623, 447 N.E.2d 1055, 1058 (1st Dist.1983) (citing *Restatement* § 402A comments j and k). The BIC lighter would have been safe had the adults kept it out of Cori's reach, as the warning stated. Jurisdictions that have applied § 402A to cigarette lighters have concluded on this reasoning that the absence of child-resistant features does not make the lighters defective or unreasonably dangerous. E.g., *Adams v. Perry Furniture Co.,* 198 Mich.App. 1, 497 N.W.2d 514 (1993); *Griggs v. BIC Corp.,* 981 F.2d 1429, 1431–34 (3d Cir.1992) (Pennsylvania law); *Byler v. Scripto–Tokai Corp.,* 944 F.2d 904 (6th Cir. 1991) (Kentucky law). But cf. *Bean v. BIC Corp.,* 597 So.2d 1350 (Alabama 1992) (declining to apply any legal approach to cigarette lighters in advance of discovery).

A case decided in 1990 draws this straightforward approach into question. *Lamkin v. Towner,* 138 Ill.2d 510, 528, 150 Ill.Dec. 562, 570, 563 N.E.2d 449, 457 (1990), explains:

A plaintiff may demonstrate that a product is defective in design, so as to subject a ... manufacturer to strict liability for resulting injury, in one of two ways: (1) by introducing evidence that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner or (2) by introducing evidence that the product's design proximately caused his injury and the defendant fails to prove that on balance the benefits of the challenged design outweigh the risk of danger inherent in such designs.

See also *Doser v. Savage Manufacturing & Sales, Inc.,* 142 Ill.2d 176, 197–98, 154 Ill.Dec. 593, 603, 568 N.E.2d 814, 824 (1990). Plaintiff invokes both of these methods. It is foreseeable that some lighters will fall into the hands of children, who do not appreciate their risks. Thus plaintiff contends that BIC is liable under *Lamkin*'s first approach, the "consumer contemplation test." As for the second or "risk-utility test," plaintiff contends that the costs and benefits of adding child-resistant features to lighters are debatable questions that must be submitted to a trier of fact. BIC replies that the consumer contemplation test asks whether the *purchaser* can appreciate the risks and use the product safely—so that the customer may make an intelligent decision whether the benefits of the item outweigh the risks—rather than whether the manufacturer can foresee that non-purchasers will acquire and misuse the product. On any other approach, BIC observes, kitchen knives are defective products because children may cut themselves, aspirin is defective because children may take too many tablets, and so on. According to BIC, the risk-utility test applies only to complex products or the unexpected behavior of simple products. A lighter is not complex, people can understand its actions (and risks), and this lighter performed just as it was supposed to.

Each side has support for its position. Start with consumer contemplation. None of the cases expressly addresses the question whether the "consumer" for this purpose is the purchaser or includes any user (or misuser) the manufacturer can foresee. Plaintiff invokes what he characterizes as the plain language of *Lamkin*. BIC replies that, although the persons injured in that case were children who fell through a screen window, the court asked whether their parents could appreciate the risk rather than whether manufacturers could foresee that children could fall through if not restrained by their parents. *Lamkin* spoke of the ordinary consumer, not the foreseeable user. *Doser* says that the "liability of a manufacturer extends to those individuals to whom injury from an unreasonably dangerous product may be reasonably foreseen" (142 Ill.2d at 197–98, 154

Ill.Dec. at 603, 568 N.E.2d at 824) but does not tell us whether foreseeable risks to non-purchasers are themselves enough to make the product "unreasonably dangerous."

On the risk-utility front things are no clearer. Once again plaintiff emphasizes the language of the passage in *Lamkin* we have quoted, but judicial opinions should not be confused with statutes. Qualifications often are implied or developed as the judges grapple with additional circumstances. *Scoby v. Vulcan–Hart Corp.*, 211 Ill.App.3d 106, 155 Ill.Dec. 536, 569 N.E.2d 1147 (4th Dist.1991), holds that when the product is simple or the risks easy to appreciate, the consumer contemplation test is the sole measure, emphasizing a portion of *Lamkin* that reiterated the observation in *Hunt* that strict liability is limited to attributes of the product that are hidden or otherwise fall outside consumers' usual expectations. *Scoby* concluded: "We do not deem that *Lamkin* or other cases ... intend that all manufacturers of products ... should be subject to liability depending upon a trier of fact's balancing under that test ... Considering not only the obvious nature of any danger here but, also, the simple nature of the mechanism involved, we conclude that the circuit court properly applied only the consumer-user contemplation test." 211 Ill. App.3d at 112, 155 Ill.Dec. at 540, 569 N.E.2d at 1151. See also *Mason v. Ashland Exploration, Inc.,* 965 F.2d 1421, 1428 n. 8 (7th Cir.1992) (treating *Scoby* as an authoritative gloss on *Lamkin* ); *Carroll v. Otis Elevator Co.,* 896 F.2d 210, 215–18 (7th Cir.1990) (concurring opinion) (doubting whether a universal cost-benefit approach to design questions in tort litigation would improve product quality at tolerable cost). Estimating the costs and benefits of a child-resistant design could be quite difficult, with corresponding costs and risks of error.[†] For his part, plaintiff emphasizes *Harnischfeger Corp. v. Gleason Crane Rentals, Inc.,* 223 Ill.App.3d 444, 165 Ill.Dec. 770, 585 N.E.2d 166 (5th Dist.1991), which applied the risk-utility test to the design of a crane, even though the danger in question—electrocution from bringing the crane into contact with overhead power lines—was obvious to everyone. *Harnischfeger* concluded that a cost-benefit analysis of the product's design is essential no matter how transparent the risk. BIC insists that *Harnischfeger* is limited to complex products such as cranes, and a few cases suggest such a limitation even while applying the risk-utility test to the product at hand. *Besse v. Deere & Co.,* 237 Ill.App.3d 497, 500–01, 178 Ill.Dec. 475, 478, 604 N.E.2d 998, 1001 (3d Dist.1992) (citing *Scoby* favorably).

█ When acting under the diversity jurisdiction, a federal court must attempt to decide the case as the highest court of the state supplying the law would do. The disagreement among the appellate courts of Illi-

---

† Both costs and benefits are elusive. The CPSC estimates that child-resistant lighters would cost approximately 15¢ to 20¢ more per unit in the marketplace. 58 Fed.Reg. at 37566. About 678 million lighters are sold in the United States each year. *Id.* at 37563. The CPSC could not estimate total costs because it did not know what would happen to sales at the higher prices (particularly for "specialty" lighters, which sell in smaller quantities and therefore would incur much higher per-unit costs of compliance). Users of the lighters will suffer some inconvenience, which also counts as a cost—especially to older users whose fingers may not be strong or nimble enough. The benefits look clear enough: by the CPSC's estimate, the total cost of fires set by children under five playing with lighters is $385 million per year. *Id.* at 37564. At first glance, the benefits easily exceed the costs. But child-resistant lighters will not eliminate the fires. Child-resistant is not child-*proof;* the CPSC estimates that 15% of children will be able to use the lighters notwithstanding the safeguards and will set 30% of the former number of fires. *Id.* at 37564. The cost and inconvenience will lead some adults to switch from lighters to matches, posing fire hazards of their own (which CPSC estimates at one-third of the risk of lighters), or to refillable lighters, which are not covered by the rule. And all child-resistant designs present a subtle risk. Parents who (mistakenly) believe that the products are child-proof are more likely to leave them within youngsters' reach. Instead of having zero ability to play with lighters, formerly out of their grasp, these children now have a 15% chance of being able to set a fire. A false sense of security could be fatal. The introduction of child-resistant medicine bottles actually led to an increase in certain kinds of poisonings as parents relaxed their vigilance. W. Kip Viscusi, *Consumer Behavior and the Safety Effects of Product Safety Regulation,* 28 J.L. & Econ. 527, 537–48 (1985); see also Cass R. Sunstein, *Paradoxes of the Regulatory State,* 57 U.Chi. L.Rev. 407, 417–19 (1990). It is hard to know whether child-resistant lighters will produce the same effect.

nois shows the difficulty of doing this. Certification is an alternative to prognostication. See *Lehman Brothers v. Schein,* 416 U.S. 386, 390–91, 94 S.Ct. 1741, 1743–44, 40 L.Ed.2d 215 (1974); Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, 17A *Federal Practice and Procedure* § 4248 (2d ed. 1988). Circuit Rule 52 permits us to certify a question of state law when the answer "will control the outcome" of the case. Rule 20 of the Rules of the Supreme Court of Illinois authorizes that court to answer a certified question when the answer "may be determinative of the said cause".

Most debatable issues of state law that arise in diversity litigation must be resolved in federal court if only because certification of all disputes would overwhelm the capacity of the state's highest court. The federal court may essay an answer, resolving the case without subjecting either the parties or the state to the need for an additional hearing, yet without hampering the state's ability to craft its own law. Sometimes, however, the federal court's answer may have effects independent of its persuasive power. In a case such as ours, for example, any substantial divergence between the federal court's estimate of state law and the state's view of its own law will funnel all similar litigation to federal court. None of the manufacturers or principal importers of cigarette lighters is a citizen of Illinois (indeed, only BIC manufactures any disposable cigarette lighters in the United States, 58 Fed.Reg. at 37565), and the damages in these cases exceed $50,000, so the diversity jurisdiction is always available. If the federal court treats the plaintiff more favorably than the state tribunal would, then the plaintiff always files in federal court; similarly any departure in the manufacturer's favor leads the defendant to remove any suit filed in state court. In either case, the state loses the ability to develop or restate the principles that it believes should govern the category of cases. Certification then ensures that the law we apply is genuinely *state* law. *Covalt v. Carey Canada Inc.,* 860 F.2d 1434, 1440–41 (7th Cir.1988). The panel's analysis had substantial propensity to attract all future cases of this kind into federal court; an error in either direction could do so. Little would be served by substituting the guess of eleven judges for that of three; far better to pose the questions to the only judges who can give definitive answers.

■■■ Now that the warning question has been resolved, the consumer contemplation and risk-utility tests have become potentially dispositive, making certification appropriate under both state and federal rules. We respectfully request the Supreme Court of Illinois to answer the following questions:

1. Whether the "consumer" for purposes of the consumer contemplation test includes non-purchasers who the manufacturer should foresee will use or misuse the product.

2. Whether the risk-utility test applies to consumer products whose risks can be appreciated by their intended users.

It may be that when revisiting the state's law of products liability the Justices of the Supreme Court of Illinois will conclude that these are not the right questions. In that event, the Justices should feel free to reformulate the questions, just as they would when dealing with the issues posed in a petition for leave to appeal. It is not our purpose to constrain the state court. The Clerk will transmit the record and briefs in this case to the Supreme Court of Illinois.

FLAUM, *Circuit Judge,* with whom CUDAHY, *Circuit Judge,* joins, concurring.

After some pause, I accept this court's judgment and opinion—both affirming the district court's order granting BIC summary judgment on Plaintiff's warning theory, and certifying the "consumer-contemplation" and "risk-utility" questions for resolution by the Illinois Supreme Court. *See* Opinion *ante* parts I & II respectively. While I remain partial to the view that Illinois' supreme court case law required the federal district court to apply the risk-utility doctrine in product liability cases, the varying strong convictions of my colleagues have convinced me that perhaps Illinois law may not be as conclusive as I once thought. Nevertheless, I write separately to counsel restraint when diversity requires our interpretation of Illinois Supreme Court case law.

When this court sits in diversity, federalism requires us to enforce the substantive law of the appropriate state, even when we conclude we see a more enlightened path. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state.... [a]nd whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern."); *see also Guaranty Trust v. York,* 326 U.S. 99, 110, 65 S.Ct. 1464, 1470, 89 L.Ed. 2079 (1945) ("*Erie R. Co. v. Tompkins* has been applied with an eye alert to essentials in avoiding disregard of State law in diversity cases. A policy so important to our federalism must be kept free from entanglements with analytical or terminological niceties."), *overruled* on other grounds by *Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 1138, 14 L.Ed.2d 8 (1965). Federalism proscribes unwarranted federal judicial meddling in state matters because such interference would "prevent the informed evolution of state policy by state tribunals." *Moore v. Sims,* 442 U.S. 415, 429–30, 99 S.Ct. 2371, 2380, 60 L.Ed.2d 994 (1979), citing *Trainor v. Hernandez,* 431 U.S. 434, 445, 97 S.Ct. 1911, 1919, 52 L.Ed.2d 486 (1977).

While I appreciate the sound and persuasive policy reasons for limiting access to a risk-utility jury test when a plaintiff has freely undertaken to use a product with obvious risks, the Illinois Supreme Court, in cases such as *Lamkin,* 138 Ill.2d at 528, 150 Ill. Dec. at 570, 563 N.E.2d at 457, and *Doser,* 142 Ill.2d at 197–98, 154 Ill.Dec. at 603, 568 N.E.2d at 824, appears to disagree. In *Lamkin,* the Illinois Court defines a defective product as one that fails the risk-utility test. *See ante* at 6, discussing *Lamkin,* 138 Ill.2d at 528, 150 Ill.Dec. at 570, 563 N.E.2d at 457. In *Doser,* the Illinois Court confirmed the appropriateness of the risk-utility test for products with patent dangers. 142 Ill.2d 176, 154 Ill.Dec. at 598, 568 N.E.2d at 819. When analyzing unreasonably dangerous products in Illinois, "[t]he balancing of the likelihood and gravity of harm must be weighted against the burden of the precaution which would be effective to avoid the harm." *Id.,* citing *Burke v. Illinois Power Co.,* 57 Ill. App.3d 498, 511, 15 Ill.Dec. 670, 683, 373 N.E.2d 1354, 1367 (1st Dist.1973). As the Illinois Supreme Court explained, in Illinois, "[w]hether a product is unreasonably dangerous for failure to incorporate safety devices is ordinarily a question of fact which the jury should resolve." *Doser,* 142 Ill.2d 176, 154 Ill.Dec. at 609 & 613, 568 N.E.2d at 820 & 824.

Neither *Lamkin* nor *Doser* appear to hint at any limitation of the risk-utility doctrine in Illinois. While *Scoby,* a decision from the Illinois Fourth District Appellate Court, may have rejected the risk-utility test as a means of analyzing whether lid-covers are required on cooking pots,[1] 211 Ill.App.3d 106, 155 Ill. Dec. 536, 540, 569 N.E.2d 1147, 1151 (1991), *Scoby* cannot in any way constrain *Lamkin* and *Doser.* In an hierarchical judiciary, judges of inferior courts may not limit decisions of superior courts. *See Gacy v. Welborn,* 994 F.2d 305, 310 (7th Cir.1993). It is a "fundamental principle of judicial construction that the lower judicial tribunals in Illinois are bound by decisions of the Illinois Supreme Court, and it is the duty of such tribunals to follow those decisions in similar cases." *Greenlee v. Shedd Aquarium,* 36 Ill.App.3d 924, 925, 344 N.E.2d 788, 790 (1st Dist.1976) citing *Agricultural Transp. Ass'n. v. Carpentier,* 2 Ill.2d 19, 116 N.E.2d 863 (1953). Definitive pronouncements of the State's Supreme Court, such as *Lamkin* and *Doser,* are binding upon inferior courts applying State law, "contrary [Illinois] appellate court decisions notwithstanding." *Greenlee,* 36 Ill.App.3d at 925, 344 N.E.2d at 790. Whatever the preferences of this court, the Illinois Supreme Court's adoption of the

---

1. A close reading of *Scoby* suggests that the Illinois appellate court actually conducted its own risk-utility test and concluded that a reasonable jury could never have found any economically feasible improvements to a cooking pot given the measured amount of risk. *See Scoby,* 211 Ill. App.3d 106, 155 Ill.Dec. 536, 540, 569 N.E.2d 1147, 1151. Thus *Scoby,* the case cited by my colleagues, indeed may not at all have held that a risk-utility balancing test is inapplicable for all patently dangerous products in the Fourth District.

risk-utility doctrine cannot be refashioned by the interpretive prowess of this tribunal.

Nevertheless, notwithstanding my initial read on Illinois Supreme Court case law, I assent to the majority's view—that some room for interpretation may exist in Illinois' law, and that certifying these questions to the Illinois Supreme Court is not wholly inappropriate. Thus, I join this court in its decision to affirm the district court's grant of BIC's motion for summary judgment on Plaintiff's warning theory, and to certify the consumer-contemplation and risk-utility questions for resolution by the Illinois Supreme Court.

RIPPLE, *Circuit Judge,* with whom CUDAHY, *Circuit Judge,* joins, concurring.

I, like Judge Flaum, accept this court's judgment only after some pause. My concern focuses on the consumer contemplation test.

The consumer contemplation test has been set forth recently by the Supreme Court of Illinois in *Lamkin v. Towner,* 138 Ill.2d 510, 150 Ill.Dec. 562, 563 N.E.2d 449 (1990). "A plaintiff may demonstrate that a product is defective in design ... by introducing evidence that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." *Id.* at 457. The issue with which we must grapple is the definition of a consumer for purposes of the *Lamkin* test. This issue is especially important in light of BIC's concession that Cori Smith is a foreseeable user of the lighter. If foreseeability is the crux of *Lamkin*'s consumer contemplation test, it would appear that BIC has conceded, not just a factual issue, but liability.

Most recently, in *Doser v. Savage Manufacturing & Sales, Inc.,* 142 Ill.2d 176, 154 Ill.Dec. 593, 568 N.E.2d 814 (1990), the Illinois Supreme Court revisited the circumstances that will make a product unreasonably dangerous.

The issue for the jury's determination was whether the press was unreasonably dan-

gerous. In deciding this issue, the jury also had to determine whether the accident or injury was reasonably foreseeable. The liability of a manufacturer *extends to those individuals to whom injury from an unreasonably dangerous product may be reasonably foreseen.*

*Id.,* at 824 (emphasis added). In the majority's view, this last sentence only describes the extent of duty, it does little to resolve the crucial question: "[W]hether foreseeable risks to non-purchasers are themselves enough to make the product 'unreasonably dangerous.'" *See* Opinion *ante* at 7. Therefore, it concludes, certification is warranted.

If the text of *Doser* were our sole concern, the need for certification would be weak. In the sentences preceding the statement quoted by the majority, the Supreme Court of Illinois clearly stated that the issue for the jury's determination was whether the product was unreasonably dangerous. The Court then continued, "In deciding *this* issue, the jury also had to determine whether the accident or injury was reasonably foreseeable." *Doser,* 142 Ill.2d 176, 154 Ill.Dec. 593, 603, 568 N.E.2d at 824 (emphasis added). This statement, I believe, makes it clear that foreseeability is an element in determining whether a product is unreasonably dangerous.[1]

If *Doser* were the only authority addressing the consumer contemplation test, I would favor simply applying *Doser,* the most recent statement from the Supreme Court of Illinois, and holding BIC liable under the consumer contemplation test because of its concession that Cori Smith is a foreseeable user of the lighter. However, I do not believe that we can consider only *Doser.* Over the years, the Illinois Supreme Court has had numerous occasions to consider liability under the consumer contemplation test. Some of these cases have focused on the ordinary consumer as an important factor in determining whether a product is unreasonably dangerous:

The injuries must derive from a distinct defect in the product, a defect which sub-

---

1. The dissent maintains that the Illinois Supreme Court never has mingled the concepts of foreseeable user and ordinary consumer—the first de-

fines the extent of the manufacturer's duty and the second defines when a product is unreasonably dangerous. *Doser* is just such an example.

jects those exposed to the product to an unreasonable risk of harm. The Restatement (Second) of Torts concludes that strict liability applies only when the product is "dangerous to an extent *beyond* that which would be contemplated by the ordinary [person] ..., with the ordinary knowledge common to the community as to its characteristics."

*Hunt v. Blasius*, 74 Ill.2d 203, 23 Ill.Dec. 574, 578, 384 N.E.2d 368, 372 (1978) (emphasis and changes in original). Similarly, *Lamkin* states this general standard for an unreasonably dangerous product before setting forth the two-prong design defect test. 138 Ill.2d 510, 150 Ill.Dec. at 570, 563 N.E.2d at 457 ("A product is 'unreasonably dangerous' when it is 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.'" (citations omitted)). Cori Smith, in all likelihood, is not within the group of people contemplated by the *Blasius* formulation, but a test that focuses on foreseeability alone surely would encompass her.

*Doser*, while stating its own formulation, leaves undisturbed the prior statement in *Blasius*. The existence of seemingly irreconcilable statements is one of the situations that justifies certification. Certification ensures that the law we apply is the law of the state, not a federal view superimposed on state caselaw. *Covalt v. Carey Canada Inc.*, 860 F.2d 1434, 1441 (7th Cir.1988). Although we would be justified in applying *Doser* as the last pronouncement of Illinois' highest tribunal, prudence dictates that we afford the Supreme Court of Illinois an opportunity to construe definitively the consumer contemplation test. Accordingly, I concur in the certification of this issue. If the Supreme Court of Illinois should decline to accept this certification, however, we must accept the *Doser* formulation as definitive and apply it in all cases within our diversity jurisdiction.

POSNER, Chief Judge, with whom MANION and KANNE, Circuit Judges, join, dissenting in part.

I agree that the plaintiff's claim of inadequate warnings should be dismissed, but I would go on and resolve the rest of the case along the lines proposed by Judge Manion. To certify abstract questions about the "consumer-contemplation test" and the "risk-utility test" to the state supreme court is to misunderstand the nature of common law adjudication.

Judges lack many things that legislators have, but one thing we have is first-hand experience with the facts crystallized in adversary litigation. In areas where the making of substantive rules—"legislating," in a sense—is left to judges, it is because the experience generated by the hearing of cases is thought an adequate or even a superior substitute for the sources of information and persuasion to which legislators turn (or are turned). Common law rules and principles well up out of the judges' experience with the facts of actual cases and are honed by the experience of encountering different facts in later cases.

This court is requesting the Supreme Court of Illinois to make rules applicable to all "non-purchasers" of dangerous or defective products and to "all consumer products whose risk can be appreciated by their intended users." But this is not a case about all non-purchasers or about all consumer products the risks of which are comprehensible by their intended users. It is a case about a small child who used a cigarette lighter to set a fire that killed another small child. The only issue we ought to be concerned with is whether the state supreme court would permit such a case to go to a jury. I say—with diffidence, in view of the disagreement within our court—that the answer is fairly clearly "no." As is plain from the long footnote in the majority opinion, the respective costs and benefits of child-resistant cigarette lighters raise difficult questions that a jury could not responsibly answer, and underneath them is the broader question how far, and through what institutional means, society should go to make ordinary household products child-proof (or child-resistant). If lighters are to be made child-proof, can kitchen knives, microwave ovens, and electrical sockets be far behind?

Is a comprehensive national program of protecting children from the menaces of everyday life to be formulated and administered by—juries?

These issues are obscured by this pair of certified questions neither of which mentions children, lighters, or household products, thus inviting abstract answers that may not attend sufficiently to the particularity of this case or even of the class of cases to which it belongs. Of course the Supreme Court of Illinois is not required to answer our questions, *Citizens for John W. Moore Party v. Board of Election Commissioners*, 94 Ill.Dec. 69, 487 N.E.2d 946 (1986) (per curiam); and we give it leave to reformulate them and we send it the record as well and it could I suppose restate our questions simply as, Should the district court be affirmed? But the purpose of the certification procedure is not to dump our cases, even our diversity cases, on state courts. *Kidney by Kidney v. Kolmar Laboratories, Inc.*, 808 F.2d 955, 957 (2d Cir.1987); *Dorman v. Satti*, 862 F.2d 432, 435 (2d Cir.1988); cf. *Doe v. American National Red Cross*, 976 F.2d 372, 374 (7th Cir.1992). That would convert certification to abstention, and there is no suggestion that this is an appropriate case for abstention. Cf. *Lehman Bros. v. Schein*, 416 U.S. 386, 393, 94 S.Ct. 1741, 1745, 40 L.Ed.2d 215 (1974) (concurring opinion). The purpose of certification is to identify controlling issues that can be resolved without immersion in the details of the case. *Doe v. American National Red Cross, supra*, 976 F.2d at 374; *Woodbridge Place Apartments v. Washington Square Capital, Inc.*, 965 F.2d 1429, 1434 (7th Cir.1992); *Diginet, Inc. v. Western Union ATS, Inc.*, 958 F.2d 1388, 1395 (7th Cir. 1992); see generally 17A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4248 (1988). There are many such questions, for example the question of statutory interpretation posed in our most recent certification to the Supreme Court of Illinois, *DeGrand v. Motors Ins. Corp.*, 903 F.2d 1100, 1104 (7th Cir.1990), but the ones put by the majority in this case are not among them. Certification is rarely if ever appropriate in a fact-laden common law case, such as this.

I do not think we need worry that since there are no lighter manufacturers in Illinois we shall be draining all the lighter litigation from the Illinois state courts unless we certify these questions. Plaintiffs in product liability cases frequently join local dealers or distributors as additional defendants along with the manufacturer, thus destroying diversity; and decisions in Illinois cases in which children injure children with other household products might provide definitive guidance to federal courts in lighter litigation. There are plenty of reported Illinois cases involving manufacturers' liability for product injuries to children. See, e.g., *Cozzi v. North Palos Elementary School District No. 117*, 232 Ill.App.3d 379, 173 Ill.Dec. 709, 597 N.E.2d 683 (1992); *Kempes v. Dunlop Tire & Rubber Corp.*, 192 Ill.App.3d 209, 139 Ill.Dec. 259, 548 N.E.2d 644 (1989). Some even involve children using products to injure other children. In one a seven year old ran over a four year old with a gasoline-powered lawnmower. *Wenzell v. MTD Products, Inc.*, 32 Ill.App.3d 279, 336 N.E.2d 125 (1975). (As usual in these cases, the manufacturer won.) In the only other diversity case (besides the present case) in this line, we had no difficulty resolving in favor of the manufacturer on the authority of previous decisions by the Illinois courts a case in which a lawn dart thrown by an eight year old had struck and grievously injured a two-and-a-half year old. *First National Bank v. Regents Sports Corp.*, 803 F.2d 1431 (7th Cir.1986). Although lighters have been around for many years and the liberal regime of products liability is decades old, there is only one other reported case, state or *federal*, in Illinois dealing with a lighter injury inflicted by a child—and it was a toy lighter, and the case was brought and remained in state court, and the defendant won. *Van Skike v. Zussman*, 318 N.E.2d 244, 22 Ill.App.3d 1039 (1974).

There is little danger, therefore, that by deciding this case rather than bouncing it to the state supreme court (which may bounce it right back to us) we would be depriving the Illinois courts of their rightful control over the evolution of the common law of the state. The sparsity of lighter litigation in this state shows that a conventional ground for certifi-

cation, the probability of recurrence, *Kidney by Kidney v. Kolmar Laboratories, Inc., supra,* 808 F.2d at 957, is, despite the majority's expressed concern with "attract[ing] all future [lighter] cases" into the federal courts in this state, absent too. I grant that the panel's 2–1 decision in favor of reversing the district judge's grant of summary judgment was so unexpectedly favorable to plaintiffs in this class of case that it might unless vacated have exerted the attractive force that concerns my colleagues. But it was vacated when we granted rehearing en banc. I voted to rehear the case en banc; I think we should bite the bullet and decide it now. By certifying these questions to the Supreme Court of Illinois we merely delay the resolution of the case, impair the proper operation of the common law process, and burden another court.

MANION, Circuit Judge, with whom POSNER, Chief Judge, and BAUER, COFFEY, and KANNE, Circuit Judges, join dissenting in part.

I respectfully dissent. Although I agree with the court's resolution of the warning issue, I disagree that there is any need to certify the questions about the consumer contemplation test or the risk-utility test.

Even though we are incapable of creating binding state law, we can apply existing state law. *Erie Railroad Company v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). Certification is appropriate when the existing state law is hopelessly "unclear or conflicting." *Transamerica Ins. Co. v. Henry,* 904 F.2d 387, 390 (7th Cir. 1990). If state law is merely undeveloped on a particular issue, we should make our best predictive judgment. *Heller Intern. Corp. v. Sharp,* 974 F.2d 850, 858 (7th Cir.1992). See Charles A. Wright, Arthur R. Miller and Edward H. Cooper, *Federal Practice and Procedure* § 4507, at 89 (1982) ("federal court must determine issues of state law as it believes the highest court of the state would determine them").

Illinois strict products liability law is not hopelessly unclear or conflicting. Rather, Illinois has adopted the standardized approach of Section 402A, Restatement (Second) of Torts, to assess a manufacturer's liability for injuries caused by its products. Section 402A imposes liability only on manufacturers who sell a "product in a defective condition unreasonably dangerous to the user or consumer." When a manufacturer sells an unreasonably dangerous product, its liability extends to the foreseeable user. *Doser v. Savage Manufacturing & Sales, Inc.,* 142 Ill.2d 176, 154 Ill.Dec. 593, 603, 568 N.E.2d 814, 824 (1990); *See also Winnett v. Winnett,* 57 Ill.2d 7, 10, 310 N.E.2d 1, 4 (1974) ("the liability of a manufacturer properly encompasses only those individuals to whom injury from a defective product may be reasonably foreseen and only those situations where the product is being used for the purpose for which it was intended or for which it is reasonably foreseeable that it may be used.")

Bic concedes for the purposes of this appeal that a child is a foreseeable user of a lighter. Bic contends, however, that a lighter with the warning "KEEP OUT OF REACH OF CHILDREN" is not unreasonably dangerous. We need not deflect Bic's contention to the Illinois Supreme Court for resolution. That court has already adopted the consumer contemplation test as a means to determine whether a product is unreasonably dangerous. *See Lamkin v. Towner,* 138 Ill.2d 510, 150 Ill.Dec. 562, 570, 563 N.E.2d 449, 457 (1990).

Comment (i) to Section 402A sets out the consumer contemplation test. The entire comment bears reading, but for our purposes, only a part of it bears repeating:

Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption. Ordinary sugar is a deadly poison to diabetics, and castor oil found use under Mussolini as an instrument of torture. That is not what is meant by "unreasonably dangerous" in this Section. *The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.*

(Emphasis added.) The Illinois Supreme Court frames the test as follows: "A product

is 'unreasonably dangerous' when it is 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Lamkin,* 138 Ill.2d 510, 150 Ill.Dec. at 570, 563 N.E.2d at 457 (citations omitted).

Cigarette lighters are not unreasonably dangerous under the consumer contemplation test. Ordinary consumers—if not children—know lighters cause fires. Just because a child may be a foreseeable user of a cigarette lighter does not make the child an ordinary consumer "with the ordinary knowledge common to the community as to [the product's] characteristics." Reason dictates that a child is not an ordinary consumer. Children lack knowledge common to the community regarding consumer products.[1] The Illinois Supreme Court has never mingled the separate concepts of foreseeable user and ordinary consumer. The first concept is used to determine the extent of a manufacturer's duty, while the second is used to determine whether a product is unreasonably dangerous. Because the Illinois Supreme Court has never mingled these concepts, we should not ask it to sort them out.

In *Lamkin,* the Illinois Supreme Court countenanced another test—the risk-utility test—to determine if a product is unreasonably dangerous. *Lamkin,* 138 Ill.2d 510, 150 Ill.Dec. at 570, 563 N.E.2d at 457. Illinois courts have not yet extended this test to apply to a simple but obviously dangerous consumer product. The only intermediate Illinois appellate court which has considered the issue has determined that such an extension should never take place. *Scoby v. Vulcan–Hart Corp.,* 211 Ill.App.3d 106, 155 Ill. Dec. 536, 540, 569 N.E.2d 1147, 1151 (1991). As that court recognized, absurd results attach if courts apply the risk-utility test to a simple but obviously dangerous product. Consider the ordinary kitchen knife. Sup-

pose a plaintiff cut by such a knife sued its manufacturer for failing to design a permanent retractable sheath for the knife. Should the plaintiff be able to avoid summary judgment simply by presenting statistics showing the feasibility of a permanent retractable sheath? The logical answer is no. As the court in *Scoby* recognized "[m]any manufactured products have a potential to cause substantial injury and most can be made safer by a different design." *Id.* That court refused to apply the risk-utility test to gauge a manufacturer's liability for failing to provide a cover for a kitchen fryer:

> We do not deem that Lamkin or other cases applying aspects of the danger-utility test intend that all manufacturers of products described above should be subject to liability depending on the trier of fact's balancing under that test, when suit is brought by one injured by such a product. Somewhere, a line must be drawn beyond which the danger-utility test cannot be applied. Considering not only the obvious nature of any danger here but, also, the simple nature of the mechanism involved, we conclude that the circuit court properly applied only the consumer-user contemplation test. Under that test, summary judgment for the defendant was clearly proper.

*Id.* *Scoby* is our best source to predict whether Illinois would apply the risk-utility test to a simple but obviously dangerous product, such as a lighter. See Wright, Miller and Cooper, § 4507, at 94 ("If a state's highest court has not ruled on an issue, intermediate appellate court decisions constitute the next best indicia of what state law is."). We do not overstep our bounds as a federal court by predicting that the Illinois Supreme Court would adopt the position advanced in *Scoby.*

Our system allows parties to present issues of state law to federal courts. 28 U.S.C.

---

1. Consider the absurd results if courts were required to look to the expectations of children when gauging a product's dangerousness. Children cannot perceive the risk of harm which accompanies the misuse of just about any product. For instance, it is not within a child's contemplation that a bar of soap left on a staircase may cause tragedy. That fact does not make a bar of soap unreasonably dangerous. Unlike a child, the ordinary consumer knows that a misplaced bar of soap can cause someone to slip and fall. Because of this, a bar of soap is not "dangerous to an extent beyond that which would be contemplated by the ordinary consumer."

§ 1332; *Erie*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. Bic and the Todds are before us, and we are capable of giving them an answer. Under readily apparent Illinois law, a lighter is not unreasonably dangerous. The district court correctly granted summary judgment in Bic's favor.